UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INGENCO HOLDINGS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>CCI U.S. ASSET HOLDINGS LLC,<br><br>SERVE:<br>CORPORATION SERVICES COMPANY<br>80 STATE STREET<br>ALBANY, NY 12207-2543<br><br>Defendant. | Civil Action No.: 17-cv-00811 |

## COMPLAINT

Defendant CCI U.S. Asset Holdings LLC ("CCI") breached its equity purchase agreement with Plaintiff Ingenco Holdings, LLC ("Ingenco") by asserting bad faith indemnification claims in a bald-faced attempt to re-trade the parties' transaction. Ingenco therefore brings this Complaint for a declaratory judgment, breach of contract, breach of the implied covenant of good faith and fair dealing, and contractual indemnification.

### INTRODUCTION

1. CCI is a wholly owned subsidiary of Castleton Commodities International LLC, a global commodities-trading firm that reportedly had sales of almost $14 billion in 2014, is backed by hedge fund billionaires, and is run by a former Enron energy trader.

2. Ingenco is a pioneer in the green energy field of landfill gas electricity generation, which, before the transaction described below, owned, designed, developed, constructed, and

operated landfill-gas-to-electricity and distributed generation facilities across the Mid-Atlantic. Ingenco's predecessor was founded by Charles Packard in 1989.

3. In 2015 CCI agreed to buy from Ingenco all of the equity interests of certain of Ingenco's subsidiaries that operated landfill-gas-to-electricity and distributed generation plants (the "Transaction"). The parties' agreement was memorialized in an Equity Purchase Agreement dated March 17, 2015 (the "Purchase Agreement").

4. The Purchase Agreement provided that $4.2 million of the $42 million base purchase price would be placed into an escrow account and held until 15 months after the closing date of the Transaction. Absent a good-faith indemnification claim under the Agreement, the $4.2 million was to be disbursed to Ingenco.

5. The Transaction closed on May 27, 2015. On October 23, 2015, CCI claimed that Ingenco was required to indemnify CCI for certain breaches of the Purchase Agreement. CCI has continued to assert its indemnity claims up to the present.

6. CCI's indemnity claims are baseless, made in bad faith, and part of a scheme to re-trade the Transaction and deprive Ingenco of the fruits of its bargain.

7. CCI is required to release the $4.2 million escrow fund to Ingenco. Relying on its bad-faith indemnification claims, CCI has refused to do so. Ingenco therefore brings this Complaint.

## THE PARTIES

8. Ingenco is a Delaware limited liability company with its principal place of business in Charlottesville, Virginia.

9. CCI is a Delaware limited liability company with its principal place of business in Stamford, Connecticut.

## JURISDICTION AND VENUE

10. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship of the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11. This Court has personal jurisdiction over CCI because CCI agreed to submit to the jurisdiction of this Court pursuant to Section 11.7 of the Purchase Agreement.

12. Venue is proper pursuant to 28 U.S.C. § 1391 because the parties agreed to submit this dispute to the exclusive jurisdiction and venue of this Court pursuant to Section 11.7 of the Purchase Agreement.

## FACTS

### *Ingenco and Castleton*

13. Ingenco is an energy-generation company, the predecessor of which was founded by Charles Packard in 1989. Ingenco's generation facilities initially operated diesel engines, but in the early 1990s Ingenco began exploring the use of landfill gas to operate its generation facilities. Landfill-gas-to-electricity generation is a renewable energy source that provides environmental benefits by reducing the release into the atmosphere of the greenhouse gas methane that is generated by landfills.

14. Over more than 20 years of growth, Ingenco ultimately operated numerous landfill-gas-to-electricity and distributed generation facilities located in the Mid-Atlantic. Ingenco sold the electricity generated by its landfill-gas-to-electricity facilities into the PJM Interconnection ("PJM") wholesale electricity market, to utility companies, and directly to end-users, including various colleges, universities, and businesses.

15. In 2013, Ingenco's founder and majority owner, Charles Packard, began to explore the sale of Ingenco's assets and retained investment bankers to assist in that process.

16. In that sale process, Ingenco's investment bankers were approached by the global commodities-trading firm Castleton Commodities International LLC ("Castleton"), which markets a broad range of physical commodities, including natural gas, natural gas liquids, refined products, crude oil, fuel oil, freight, petrochemicals, electric power and coal and financial instruments related to commodities. Castleton is headquartered in Stamford Connecticut and has offices in Texas, Canada, China, England, Switzerland, and Uruguay.

17. Castleton was interested in making an investment in the renewable energy space by acquiring an entity that sold renewable electricity into the PJM wholesale electricity market and that had exposure to market movements.

18. Ingenco and Castleton ultimately agreed to explore a possible transaction.

*The Transaction*

19. On April 2, 2014, Castleton entered into a non-disclosure agreement with Ingenco's investment bankers, pursuant to which Castleton and its subsidiaries and their representatives obtained access to various information concerning Ingenco and its business, including operational and financial information for Ingenco's generation subsidiaries.

20. Beginning in April 2014 and continuing until the closing date, Castleton conducted due diligence on Ingenco and its subsidiaries, including reviewing and analyzing the information about Ingenco's capacity delivery obligations into the PJM wholesale electricity market and the operational status and history of Ingenco's generation facilities.

21. Castleton, through its subsidiary CCI, ultimately agreed to buy from Ingenco all of the equity interests of certain of Ingenco's subsidiaries (the "Transaction").

22. CCI and Ingenco's agreement regarding the Transaction was memorialized in an Equity Purchase Agreement dated March 17, 2015 (the "Purchase Agreement"). The Purchase Agreement contains certain representations, warranties, and covenants of the parties related to the Transaction.

23. The Transaction closed on May 27, 2015 (the "Closing Date").

### *The Equity Purchase Agreement's Escrow Fund*

24. CCI agreed to pay $42 million to Ingenco under the Purchase Agreement, subject to certain adjustments.[1]

25. The Purchase Agreement provided that, at the closing, CCI would deposit 10% of the $42 million base purchase price into an escrow account (the "Escrow Fund"). Purchase Agreement § 2.6.

26. The Purchase Agreement stated that the Escrow Fund "shall be held in escrow for a period of [15] months following the Closing Date and shall secure the indemnification obligations of [Ingenco] under" the Purchase Agreement. *Id.*

27. The Purchase Agreement stated that "[a]t the conclusion of the period ending on the fifteen month anniversary of the Closing Date, the Escrow Agent shall disburse to [Ingenco] any Escrow Funds not theretofore paid in accordance with the terms of, or subject to a pending claim under . . . [the Purchase] Agreement, pursuant to the terms and provisions of the Escrow Agreement." *Id.*

---

[1] CCI has copies of the Purchase Agreement, its exhibits, and all related documents, including the Escrow Agreement, in its possession, custody, and control; therefore, it is unnecessary to attach the Purchase Agreement as an exhibit to the Complaint for CCI to frame a responsive pleading. Ingenco will consult with CCI's counsel to address the use of the Purchase Agreement and all related documents in this matter.

28. The Escrow Agreement stated that after "receipt of written instruction . . . signed by an authorized representative of" CCI and Ingenco, "the Escrow Agent shall disburse the" Escrow Fund. Escrow Agreement § 1.3.

### *The Equity Purchase Agreement's Indemnity Provisions*

29. The Purchase Agreement provides that, subject to certain limitations, Ingenco "shall indemnify and hold harmless" CCI for losses "attributable or resulting from . . . any breach of inaccuracy of any representation or warranty of [Ingenco] contained in [the Purchase] Agreement" or "any breach of any covenant or agreement of [Ingenco] contained in [the Purchase] Agreement." Purchase Agreement § 9.1(a)(i), (ii).

30. Under the Purchase Agreement, any claim for indemnity must be made in good faith. The indemnity provisions provide that: the parties' indemnification obligations for the parties' representations and warranties—with limited exceptions not relevant here—expire after set periods post-closing unless "a written claim or notice is duly given in good faith," in which case the indemnification claim survives until it is resolved, Purchase Agreement § 9.2(b); an indemnification claim "shall specify the amount of[,] or if not finally determined, a good faith estimate of" the claimed indemnification amount, *id.* § 9.5(a); and the parties "shall attempt in good faith to resolve any disputes" regarding any claimed indemnification, *id.* § 9.5(e).

### *CCI's Working Capital Adjustment Claims*

31. The Purchase Agreement required Ingenco to deliver, before the Closing Date, an estimate as of the Closing Date of the aggregate working capital—current assets minus current liabilities—of the subsidiaries sold in the Transaction. Purchase Agreement § 2.7(a).

32. The Purchase Agreement required CCI, after the Closing Date, to prepare a "good faith computation of the actual" working capital as of the Closing Date. *Id.* § 2.7(b).

33. The Purchase Agreement allowed Ingenco to object to CCI's working capital computation and provided a mechanism by which any dispute regarding the working capital computation would be resolved. *Id.* §§ 2.7(b), (d).

34. CCI delivered its post-Closing Date working capital computation, to which Ingenco objected (the "Working Capital Dispute"). The parties' Working Capital Dispute was ultimately resolved.

35. As part of the Working Capital Dispute, CCI claimed, among other things, that the working capital should be adjusted by: nearly $2 million dollars based on Ingenco purported failure to disclose overcommitted capacity related to one of Ingenco's subsidiaries' regulatory obligations (the "AEP FRR Claim"); and nearly $500,000 based on purported undisclosed capacity sale and repurchase obligations related to the PJM (the "Working Capital Capacity Claim"). CCI ultimately withdrew both the AEP FRR Claim and the Working Capital Capacity Claim.

### *CCI's Bad Faith Indemnity Claims*

36. On October 23, 2015, CCI submitted an indemnification claim of $4,333,364 to Ingenco, asserting that Ingenco was required to indemnify CCI under Section 9.1 of the Purchase Agreement because of Ingenco's purported breaches of various representations, warranties, and covenants in the Purchase Agreement (the "Indemnification Claims").

37. On October 30, 2015, November 9, 2015, December 1, 2015, December 15, 2105, January 7, 2016, and May 2, 2016, Ingenco sent letters to CCI requesting supporting documentation and calculations for the Indemnification Claims.

38. On July 1, 2016, CCI sent a second indemnification claim letter, adding additional claims and increasing its requested indemnification amount to $6,897,312.

39. In an August 11, 2016 letter, CCI put "the Escrow Agent on notice of the [Indemnification Claims] . . . and of [CCI's] claim to the escrowed funds."

40. On August 26 2016, CCI sent a third indemnification letter, increasing its requested indemnification amount to $9,480,312.

41. CCI's indemnification claims are not made in good faith but instead in an effort to delay and frustrate Ingenco's receipt of the Escrow Funds, with the intent to re-trade the parties' Transaction by forcing Ingenco to give up the Escrow Funds.

42. As one example, CCI bases one of its Indemnification Claims on Ingenco's purported misrepresentations about certain of Ingenco's subsidiaries' Equivalent Forced Outage Rates ("EFORd"), a measurement relevant to the sale of capacity into the PJM. During its nearly-year-long due diligence on Ingenco and its subsidiaries, Castleton never requested, or otherwise sought to obtain, EFORd rates, and the EFORd rates are not the subject of any representation or warranty in the Purchase Agreement.

43. As another example, CCI bases one of its Indemnification Claims on Ingenco's purported failure to maintain certain of the generation plants' engines between the signing of the Purchase Agreement and the Closing Date, leading to engine outages. The number of plant engines out of service—an important operating metric maintained weekly by Ingenco—actually *decreased* in the period between the signing of the Purchase Agreement and the Closing Date, indicating a successful effort by Ingenco to maintain the condition of the engines between the signing and closing of the Purchase Agreement.

44. As another example, as bases for its Indemnification Claims CCI has re-asserted the AEP FRR Claim and claims substantially similar to its Working Capital Capacity Claim, both of which CCI willingly withdrew during the Working Capital Dispute.

45. As a final example, CCI asserts that Ingenco over-sold its generation capacity and therefore had capacity shortfalls. CCI, however, was aware of and strongly encouraged Ingenco's ordinary-course practice of selling electricity directly to commercial and industrial consumers and, if needed, buying in the open market additional capacity to support these sales, which on information and belief is a strategy that has benefitted and continues to benefit CCI financially.

46. As these examples illustrate, CCI's Indemnification Claims are meritless and not made in good faith but instead in an effort to deprive Ingenco of the Escrow Fund and Ingenco's ability to use the funds now held in escrow, to each of which Ingenco is entitled under the Purchase Agreement.

## COUNT ONE
## DECLARATORY JUDGMENT—INDEMNIFICATION CLAIMS

47. Ingenco reincorporates by reference the preceding paragraphs of this Complaint.

48. As described above, CCI's Indemnification Claims are meritless and not made in good faith.

49. Ingenco has denied its liability for CCI's Indemnification Claims.

50. By asserting its Indemnification Claims, CCI has created an actual and justiciable controversy between the parties that may be heard and determined by this Court under 28 U.S.C. § 2201.

51. This Court's judgment on Ingenco's right to the Escrow Fund and the validity of CCI's Indemnification Claim will finalize the controversy and offer Ingenco relief from CCI's Indemnification Claim.

## COUNT TWO
## DECLARATORY JUDGMENT—ESCROW FUND

52. Ingenco reincorporates by reference the preceding paragraphs of this Complaint.

53. Under Section 2.6 of the Purchase Agreement, CCI is required to direct the escrow agent to disburse the Escrow Fund to Ingenco after the 15-month anniversary of the Closing Date, or August 27, 2016.

54. CCI has relied on its Indemnification Claims as a basis to refuse to direct the escrow agent to disburse the Escrow Fund to Ingenco.

55. As described above, CCI's Indemnification Claims are meritless and not made in good faith.

56. Ingenco has denied its liability for CCI's Indemnification Claims and has requested that CCI direct the escrow agent to disburse the Escrow Funds to Ingenco.

57. By refusing to direct the escrow agent to disburse the Escrow Funds to Ingenco, CCI has created an actual and justiciable controversy between the parties that may be heard and determined by this Court under 28 U.S.C. § 2201.

58. This Court's judgment on the propriety of CCI's refusal to direct the Escrow Agent to disburse the Escrow Fund to Ingenco will finalize the controversy and offer Ingenco relief from CCI's improper refusal to direct the escrow agent to disburse the Escrow Fund to Ingenco.

## COUNT THREE
## BREACH OF CONTRACT—ESCROW FUND

59. Ingenco reincorporates by reference the preceding paragraphs of this Complaint.

60. Under Section 2.6 of the Purchase Agreement, CCI is required to direct the escrow agent to disburse the Escrow Fund to Ingenco after the 15-month anniversary of the Closing Date, or August 27, 2016.

61. Ingenco has performed its obligations under the Purchase Agreement, including all obligations required to make the Escrow Fund disbursable to Ingenco.

62. The Escrow Fund is not the subject of any valid, good faith claim for indemnification that gives CCI the right under the Purchase Agreement to withhold its direction to disburse the Escrow Fund.

63. CCI has breached Section 2.6 of the Purchase Agreement by not directing the escrow agent to disburse the Escrow Fund to Ingenco.

64. As a result of CCI's breach of the Purchase Agreement in its refusal to direct that the Escrow Fund be disbursed to Ingenco, Ingenco has suffered damages in an amount to be proven at trial, but which damages are not less than $4.2 million.

## COUNT FOUR
## BREACH OF CONTRACT—INDEMNIFICATION

65. Ingenco reincorporates by reference the preceding paragraphs of this Complaint.

66. Under Article IX of the Purchase Agreement, a claim for indemnification must be made in good faith.

67. The indemnity provisions provide that: Ingenco's indemnification obligations for the representations and warranties relevant here expire unless "a written claim or notice is duly given in good faith," Purchase Agreement § 9.2(b); CCI's indemnification claim "shall specify . . . a good faith estimate of" the claimed indemnification amount, *id.* § 9.5(a); and the parties "shall attempt in good faith to resolve any disputes" regarding any claimed indemnification, *id.* § 9.5(e).

68. CCI is therefore required to act in good faith with respect to any claim for indemnification claim made pursuant to Article IX of the Purchase Agreement.

69. Ingenco has performed its obligations under the Purchase Agreement, including all obligations related to Article IX.

70. As described above, CCI has breached Article IX of the Purchase Agreement by not acting in good faith with respect to its Indemnification Claims.

71. As a result of CCI's breach of Article IX of the Purchase Agreement, Ingenco has suffered damages in an amount to be proven at trial, but which damages are not less than $4.2 million.

## COUNT FIVE
## BREACH OF THE IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING

72. Ingenco reincorporates by reference the preceding paragraphs of this Complaint.

73. CCI's refusal to direct the escrow agent to disburse the Escrow Fund to Ingenco based on CCI's Indemnification Claims constitutes a contractual breach of the implied covenant of good faith and fair dealing.

74. New York law[2] implies a covenant of good faith and fair dealing in all contracts in the course of the performance of the contract, through which each contracting party covenants and agrees that it will do nothing that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

75. Under the implied covenant of good faith and fair dealing, a party cannot exercise a contractual right as part of a scheme to deprive the other party of the fruits of its bargain.

---

[2] The parties agreed in Section 11.10 of the Purchase Agreement that it "shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to any conflict or choice of law provision that would result in the application of another state's law."

76. Under the implied covenant of good faith and fair dealing, a party must exercise any contractual discretion in good faith and may not exercise contractual discretion in bad faith, even when that discretion is vested solely in that party.

77. Under the implied covenant of good faith and fair dealing, where a party has contractual discretion it may not exercise that discretion arbitrarily or irrationally.

78. As described above, by relying on its Indemnification Claims as a basis to refuse to direct the escrow agent to disburse the Escrow Funds to Ingenco, CCI has destroyed or injured Ingenco's right to receive the fruits of its bargain.

79. By relying on its Indemnification Claims as a basis to refuse to direct the escrow agent to disburse the Escrow Fund to Ingenco, CCI has exercised a contractual right as part of a scheme to deprive Ingenco of the fruits of its bargain.

80. By relying on its Indemnification Claims as a basis to refuse to direct the escrow agent to disburse the Escrow Fund to Ingenco, CCI has acted in bad faith.

81. By relying on its Indemnification Claims as a basis to refuse to direct the escrow agent to disburse the Escrow Fund to Ingenco, CCI has acted arbitrarily or irrationally.

82. For the reasons described above, the implied covenant of good faith and fair dealing is implicit in the Purchase Agreement's indemnification provisions, which require that the parties act in good faith when asserting indemnification claims.

83. CCI therefore breached the implied covenant of good faith and fair dealing in the Purchase Agreement.

84. As a result of CCI's breach of the implied covenant of good faith and fair dealing in the Purchase Agreement, Ingenco has suffered damages in an amount to be proven at trial, but which damages are not less than $4.2 million.

## COUNT SIX
## INDEMNIFICATION

85. Ingenco reincorporates by reference the preceding paragraphs of this Complaint.

86. CCI agreed in to indemnify Ingenco for any and all losses for "any breach of any covenant or agreement of [CCI] contained in [the Purchase] Agreement." Purchase Agreement Section 9.1(b)(ii).

87. As described above, CCI has breached its agreements contained in Article IX of the Purchase Agreement by not acting in good faith with respect to its Indemnification Claims.

88. As described above, CCI has breached its implied covenant of good faith and fair dealing contained the Purchase Agreement by not acting in good faith with respect to its Indemnification Claims.

89. Ingenco has performed its obligations under the Purchase Agreement, including all obligations related to Article IX.

90. As defined in the Purchase Agreement, the "losses" for which CCI must indemnify Ingenco include "any and all . . . losses and expenses (including interest, court costs, reasonable fees of attorneys, accountants and other experts or other reasonable expenses of litigation or other proceedings or of any claim, default or assessment)."

91. Because of its CCI's breaches of its covenants and agreements in the Purchase Agreement, CCI must indemnify Ingenco for its losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ingenco Holdings, LLC, requests the following relief:

A. A declaration that CCI's Indemnification Claims are invalid;

B. A declaration that CCI is required to take all actions necessary to have the Escrow Fund disbursed to Ingenco;

C.    Judgment for Ingenco awarding Ingenco its full damages for all economic, monetary, actual, direct, and compensatory damages that it suffered as a result of CCI's unlawful and inequitable conduct, which amount will be proven at trial but is not less than $4.2 million;

D.    An order of specific performance requiring CCI to take all actions necessary to have the Escrow Fund disbursed to Ingenco;

E.    An award of attorneys' and other fees and costs and expenses of this litigation;

F.    An award of pre-judgment interest to the extent allowable by law, which amount is 9 percent per year under N.Y. C.P.L.R. §§ 5001(a) and 5004;

G.    An award of post-judgment interest to the extent allowable by law; and

H.    Entry of an order for any further relief as the Court may deem just and proper.

Dated: February 2, 2017

Respectfully submitted,

*[signature]*

Michael E. Twomey (MT7839)
KANTOR, DAVIDOFF, MANDELKER,
TWOMEY, GALLANTY & KESTEN, P.C.
415 Madison Avenue, 16th Floor
New York, NY 10017
Tel: (212) 682-8383
Fax: (212) 949-5206
Email: twomey@kantordavidoff.com

Turner A. Broughton (*pro hac vice* forthcoming)
Jonathan T. Lucier (*pro hac vice* forthcoming)
WILLIAMS MULLEN
200 South 10th Street
Richmond, VA 23219
Tel: (804) 420-6000
Fax: (804) 420-6507
Email: tbroughton@williamsmullen.com
Email: jlucier@williamsmullen.com

*Counsel for Ingenco Holdings, LLC*