J14KINGO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

INGENCO HOLDINGS, LLC,

                    Plaintiff,

            v.                              17 CV 811 (ER)

CCI U.S. ASSET HOLDINGS LLC,

                    Defendant.

------------------------------x
                                        New York, N.Y.
                                        January 4, 2019
                                        11:55 a.m.

Before:

                        HON. EDGARDO RAMOS,

                                        District Judge

                            APPEARANCES

WILLIAMS MULLEN
        Attorneys for Plaintiff
BY:  TURNER BROUGHTON
        -AND-
EISEMAN LEVINE LEHRHAUPT & KAKOYIANNIS PC
BY:  MICHAEL E. TWOMEY

STROOCK & STROOCK & LAVAN LLP
        Attorneys for Defendant
BY:  MELVIN A. BROSTERMAN

ALSO PRESENT:

Duane K. Duclaux, Castleton Commodities International LLC

J14KINGO

| | |
|---|---|
| 1 | (Case called) |
| 2 | MR. BROUGHTON:  Good morning, your Honor.  Turner |
| 3 | Broughton, on behalf of Ingenco Holdings LLC, and Michael |
| 4 | Twomey is here with me as well. |
| 5 | THE COURT:  Good morning. |
| 6 | MR. TWOMEY:  Good morning, your Honor. |
| 7 | MR. BROSTERMAN:  Good morning, your Honor.  Melvin |
| 8 | Brosterman, of Stroock & Stroock & Lavan, for |
| 9 | defendant/counterclaimant CCI USA Asset Holdings LLC. |
| 10 | THE COURT:  And good morning to you all. |
| 11 | MR. DUCLAUX:  Good morning.  Duane Duclaux, on behalf |
| 12 | of CCI USA Asset Holdings. |
| 13 | THE COURT:  Good morning. |
| 14 | I haven't seen you folks in a while.  I understand |
| 15 | that there is a discovery dispute.  So, Mr. Broughton or |
| 16 | Mr. Twomey, tell me what's going on. |
| 17 | MR. BROUGHTON:  Yes, your Honor.  Would you like -- |
| 18 | THE COURT:  You can remain seated. |
| 19 | MR. BROUGHTON:  Okay. |
| 20 | Your Honor, the discovery dispute really revolves |
| 21 | around our request to receive valuations that CCI performed |
| 22 | from the time that the transaction closed through its sale of |
| 23 | the project two and a half years later.  There really are two |
| 24 | theories of the case, and they're flip sides of the same coin, |
| 25 | in some sense. |

J14KINGO

1          As your Honor may recall from our prior conferences,

2     this was a $42 million transaction for $4.2 million that was

3     held in escrow.  From our sense of the case, or from Ingenco's

4     sense of the case, CCI got exactly what it bargained for – it

5     got a transaction where it was going to come in, Joe Rothbauer,

6     who was an individual who was deposed in this case -- four

7     people have now testified that he said on more than one

8     occasion, we buy broken assets.

9          So CCI's plan here was to buy my client's company, to

10    fix it up, and to sell it.  That's exactly what they did.  They

11    took a $42 million transaction, and in the course of two and a

12    half years, with the same physical assets, they turned that

13    into a $106 million company.  They spun it off, I believe, in a

14    related -- related entities, but that's what they valued it at.

15         So our theory of the case is they got exactly what

16    they bargained for.  This, from a discovery perspective, speaks

17    to that.

18         From our plaintiff's perspective, what plaintiff's

19    counterclaim is saying, well, wait a second, there were a

20    couple of things:  One, you didn't maintain the physical assets

21    the way you should have.  And from CCI's perspective, CCI

22    contends that that constituted a material adverse effect on the

23    business.  And the term "material adverse effect" is defined in

24    within the equity purchase agreement, but what's not defined is

25    what "material" means.

J14KINGO

1          CCI also claims -- there was a bid.  Ingenco was short

2     capacity, about 47 megawatts of capacity, and that's broken

3     into a couple of buckets.  And so Ingenco went in and acquired

4     47 megawatts of capacity in incremental auction.  Some of that

5     capacity was used for sales that ultimately resulted in sales

6     to universities, to colleges in Virginia.  And those, I think

7     the evidence will show ultimately at trial, were very, very

8     profitable.  So about 20 megawatts that CCI was short was

9     used -- rather, Ingenco was short -- was used on these college

10    transactions.  There were another 27 megawatts that Ingenco was

11    short and it bought in the open market to fulfill --

12          THE COURT:  Is that the $2 million transaction?

13          MR. BROUGHTON:  It's 2.9.

14          But, your Honor, one thing that should be clear is

15    that there's not a $2.9 million check written for that.  This

16    is the PJM Energy Market, so, as I understand things, there's

17    sort of a monthly true-up, and so over the course of the next

18    year, PJM would have paid Ingenco on its sale of energy, it

19    would have paid Ingenco for the capacity it provided, but

20    Ingenco, in turn, would have paid off the $2.9 million,

21    effectively the bid for capacity that it had put in.  So that's

22    the one that's referred to in CCI's letter.

23          So CCI's position is, that acquisition of capacity,

24    that bid for capacity, constitutes a material adverse effect.

25    So their claim is -- and you've seen this -- that we shouldn't

J14KINGO

1    be entitled to any valuation beyond the date of the closing.

2            Your Honor, I would respectfully submit that that's

3    not actually correct.  As your Honor, I'm sure is aware,

4    materiality is judged in the context of a transaction.  And so

5    where I started with this was a commonsense approach, which is

6    how material could that acquisition -- so either the

7    maintenance of the physical assets or the acquisition of

8    capacity -- how material could that have been to a business

9    that sold two and a half years later for two and a half times,

10   250 percent, of what it was acquired for?

11           Your Honor, I've got a couple of cases -- the issue of

12   materiality, I would note for your Honor, is not something --

13   material adverse effect -- that we can find much case law in

14   New York on, particularly in this context.  So we've gone and

15   found some Delaware cases, including a Delaware case applying

16   New York law.  I've got copies of those if your Honor would

17   like them.

18           THE COURT:  Okay.

19           MR. BROUGHTON:  I'll hand up two cases, your Honor.

20   One is In Re IBP, Inc. Shareholders Litigation versus Tyson

21   Foods 789 A.2d 14.  And the second case, your Honor, is an

22   unpublished opinion, which is still precedential in Delaware,

23   Akorn, Inc. versus Fresenius Kabi AG.  It's a 2018 Westlaw cite

24   4719347.

25           THE COURT:  Does Mr. Brosterman have those cases?

J14KINGO

| 1 | MR. BROUGHTON:  I'm going to hand those to

2 Mr. Brosterman right now, your Honor.

3             THE COURT:  Okay.

4             MR. BROUGHTON:  If I may approach?

5             THE COURT:  Just one case and one case?

6             MR. BROUGHTON:  Yes, your Honor.

7             Delaware Chancery Court.  They're not afraid to write

8 opinions, as your Honor probably knows, that are pretty

9 lengthy.  That's why I took the liberty of flagging and

10 highlighting the operative language.

11             THE COURT:  Okay.

12             MR. BROUGHTON:  If you go to Akorn, Inc., which is a

13 case from earlier this year -- it was decided October 1st,

14 2018 -- with regard to material adverse effect, the Delaware

15 Chancery Court wrote:  "A buyer faces a heavy burden when it

16 attempts to invoke a material adverse affect clause in order to

17 avoid its obligation to close.  A short-term hiccup in earnings

18 should not suffice; rather, the material adverse effect should

19 be material when viewed from the long-term perspective of a

20 reasonable acquirer.  In the absence of evidence to the

21 contrary, a corporate acquirer may be assumed to be purchasing

22 the target as part of a long-term strategy.  The important

23 consideration, therefore, is whether there has been an adverse

24 change in the target's business that is consequential to the

25 company's long-term earnings power over a commercially

J14KINGO

reasonable period, which one would expect be measured in years

rather than months."

So, your Honor, if you take Akorn -- and that's

quoting from IBP and IBP is the case that is based on New York

law -- when you think about what we're asking for here -- so

let's assume -- and our understanding is that CCI did conduct

interim evaluations of these assets.  So let's assume a

$42 million transaction that closes in May of 2015.  If in

December of 2015, for instance, CCI is valuing that business at

more than $42 million, then, from our perspective, and

particularly looking at the case law that we have from

Delaware, that is persuasive, that would be relevant to our

issue.

Now, ultimately, the Court may reject that when it

comes to the evidence and our arguments when it's presented,

but from a discovery perspective, your Honor, it certainly

seems that the information that we're asking for as to

valuations for a finite period of time would be something to

which, whether under Rule 401, which would be the evidentiary

standard, I think we could get it in, but even under the lower

standard of discovery would be certainly something we

respectfully submit we should be entitled to see.

Now, as to the burden piece -- so then you shift to

the proportionality that CCI raised -- we don't perceive this

as burdensome, and we're happy to work with counsel on that.  I

J14KINGO

1     do want to take on a couple of things that were raised with

2     regard to burden.

3               One was a reference to two days of depositions of the

4     CCI employee, who will now sit for a third day as the 30(b)(6)

5     representative.  Your Honor, the only reason there have been

6     two days of depositions for Mr. Brad Roman, who's the

7     individual referred to, was as an accommodation to Mr. Roman.

8     His deposition, as an accommodation to him, did not start, on

9     the first day of his deposition, until 12:30, and it ended

10    before 5:00 because he had to catch a train to Connecticut.  So

11    that's why we had to come back for a second day.

12              THE COURT:  Okay.

13              MR. BROUGHTON:  Then the second piece is, as to the

14    documents, remember, Ingenco Holdings was sold to CCI, so it's

15    no surprise that CCI has produced more documents than Ingenco

16    has, because the documents of Ingenco Holdings went to CCI as

17    part of the transaction.

18              So what we're really interested in?  I don't need all

19    of the Riverview transaction documents.  I want interim

20    evaluations, I want anything related to the valuation of the

21    Riverview transaction where this asset was valued at

22    $106 million.

23              And, your Honor, at this point, we have not received

24    any valuations from --

25              THE COURT:  But as I read your requests, you did ask

J14KINGO

| | |
|---|---|
| 1 | for all of the Riverview transaction documents? |
| 2 | MR. BROUGHTON:  We did, but that's something -- |
| 3 | proportionality has not been raised as an issue in our |
| 4 | discovery conference.  We did ask for all of them, but what I'm |
| 5 | suggesting is what counsel suggested when this came up in |
| 6 | December, was, you're going to have to raise this with the |
| 7 | Court, because our guy is not going to be prepared on it and |
| 8 | he's not going to answer questions on it -- |
| 9 | THE COURT:  Okay. |
| 10 | MR. BROUGHTON:  -- at the deposition.  So that's why |
| 11 | we brought it up. |
| 12 | But what I'm suggesting to your Honor is, I believe we |
| 13 | can work with counsel -- provided that the Court says that |
| 14 | we're entitled to the discovery, I believe we can work with |
| 15 | counsel to work out an accommodation on that, because I think |
| 16 | thus far in this case, CCI and we have, from a counsel |
| 17 | perspective, we've worked well together, we have not been |
| 18 | before your Honor, and this is on a discrete issue where, |
| 19 | rather than getting into a deposition and having somebody say |
| 20 | I'm not prepared, I'm not answering it, we felt the need to |
| 21 | have to raise it. |
| 22 | THE COURT:  How many interim valuations were there, to |
| 23 | your knowledge? |
| 24 | MR. BROUGHTON:  I don't know for certain, your Honor. |
| 25 | We understand -- and this is anecdotal -- I understand that in |

J14KINGO

1    2016 -- whether this is accurate or not, this is thirdhand --

2    that there was a valuation performed and that CCI internally

3    was valuing this business at close to $100 million.

4              Now, I don't know the answer to that because I haven't

5    seen any of those valuations.

6              THE COURT:  Okay.  Thank you.

7              Mr. Brosterman?

8              MR. BROSTERMAN:  Yes, your Honor.

9              THE COURT:  You can remain seated also if you wish.

10             MR. BROSTERMAN:  It's easier for me to stand.

11             THE COURT:  Great.

12             MR. BROSTERMAN:  I don't project all that well.

13             So just facts:  I'd like to start briefly.  This is,

14   from our perspective, really a breach of contract case, where

15   the counterclaimant -- in our view, we're the ones who were

16   owed the money here, not the plaintiff.

17             There are a couple of clauses in the contract that are

18   important.  One of the clauses that we identify in the letter

19   addressing this issue is the material adverse event clause.

20   The clause says -- if I may, your Honor, it says, "except as

21   set forth on Section 4.6 of the seller disclosure schedule" --

22   and I will get to that in a moment -- "from December 31, 2013,

23   through the date of this agreement," which was March 24 or

24   thereabouts.

25             MR. DUCLAUX:  March 15.

J14KINGO

1           MR. BROSTERMAN:  March 15, 2015.

2           -- "there has not been any event, circumstance, change

3    or effect that has had, or would reasonably be expected to

4    have, a material adverse event."  It then goes on to describe

5    what an MAE is.

6           A week before -- let me back up to the seller

7    disclosure schedule.  If they put something on the seller

8    disclosure schedule, then we don't have a claim under the

9    warranty for an MAE.  So, for example, on the seller disclosure

10   schedule, which was attached to the contract that was signed on

11   March 15th, they list a note payable of a million seven.  So if

12   we had -- because that note is something that occurred between

13   December 31, 2013, and the date of the contract, but they

14   schedule it, and, therefore, we can't claim thereafter that

15   it's an MAE, their having entered into this note or having

16   given this note of a million seven constitutes an MAE because

17   they schedule it out.

18          What happened is, one week -- and this is just one of

19   the claims in the case but it gives you an idea of the

20   flavor -- one week -- maybe it's eight days, I could be off a

21   day or two -- before the contract is signed on March 15th, they

22   go into the market and, as Mr. Broughton said, they get what's

23   called purchase capacity.  The reason they purchased capacity

24   is because in the prior periods of time, but all after

25   December 31 -- actually, even before December 31, 2013 -- they

J14KINGO

1    had sold capacity to PJM.  And selling capacity simply means

2    that I am now -- the generator is now -- obligated such that if

3    PJM, the grid operator, calls on me to produce electricity, I

4    can produce that electricity when called upon, up to the

5    amounts that I have sold capacity.  So if I sell 100 megawatts

6    of capacity for the period -- I enter into the transaction in

7    2012 and say, I'm going to deliver this, you can now -- it's an

8    option in effect, I'm going to be available to deliver

9    electricity to you in 2014, '15, '16 -- and the auctions do

10   work that way; you offer this capacity and sell it in one year

11   for periods that range three years afterwards -- that means

12   that if I sell 100 megawatts of capacity and I believe that I'm

13   going to be available to deliver a hundred megawatts, if I'm

14   called upon by PJM, I have to have a plant that's capable of

15   delivering of those hundred megawatts.  If I don't maintain the

16   plant properly -- if I have issues with the plant, if I have

17   outages at the plant -- such that instead of being able to

18   produce 100 megawatts I can only produce 80 megawatts, what

19   happens is, PGM keeps track of this, and they measure this by

20   something called an EFORD, which is a forced outage rate, and

21   come the date for my obligation to be available to deliver, if

22   I can only produce 80 megawatts, so what happens is I've sold

23   100 megawatts of capacity, that means if I'm called upon, I can

24   deliver the energy, I get an option premium effectively, I get

25   paid for this capacity.  It's one of the ways that this plant

J14KINGO

1    and others make money, by selling capacity, selling these

2    option premiums.

3            What happens on the day that PJM is entitled to call

4    on me to produce energy is, whether or not they call on me to

5    produce electricity, if I can only produce 80 megawatts of

6    electricity, such that my capacity is at 80, now at 100, PJM

7    hits me, they charge me.  So instead of getting paid for 100

8    megawatts of capacity, I get paid for something less than that,

9    and there is a penalty imposed.

10           One of the ways a generator can avoid these penalties

11   is by going into the market and purchasing capacity from

12   somebody else, so that when the time comes to deliver the

13   electricity and being available to do that, I have the

14   capacity.  Even though my plants can't generate it, I bought it

15   from somebody else, effectively.  And I have to pay for that.

16           In this case, they've paid for it, they agreed to pay,

17   and entered into contracts to pay, close to $3 million for

18   capacity.  They did that literally one week, so they obligated

19   themselves one week before the transaction was signed, to pay

20   $3 million for capacity, just as they had -- they never

21   disclosed it.  So whereas they had obligated themselves a

22   million seven on a note, which they did disclose, they never

23   disclosed this 3 million.

24           That $3 million, by any measure, whether you look at

25   the revenues of the company or the earnings of the company or

J14KINGO

the P&L of the company, was very significant.  It was

10 percent, 20 percent, even more.  It's an issue of fact as to

whether it's material.  That's one of the types of claims in

this case.  One of their defenses is, they said, well, you

know, you guys could have figured out, if you really looked

more carefully, that we didn't have the -- you wouldn't have

found this 3 million because we didn't disclose it, they don't

say we could have ever found that $3 million commitment, but if

you look more carefully, you would have realized that these

plants couldn't produce a hundred megawatts, they could only

produce 80; and, therefore, our defense to the MAE says -- the

plaintiff -- is, you know, it's your job to really find out all

these problems, and if you had carefully looked at every

document, you would have figured out we couldn't produce a

hundred, we could only produce 80.

Under New York law, which, by the way, is very

different than Delaware law, on a bunch of issues, it is -- and

I think we cite this case in our -- yes, the Assured Guaranty

case by Judge Rakoff, who cites other cases, it is no defense

to an MAE that I could have discovered the problem, that I

should have known there was a problem.  Under what's called the

Ziff-Davis Rule, which is cited in Judge Rakoff's case, it says

the exception to the Ziff-Davis Rule, which is a rule which

says that a suit for breach of an MAE is available even if you

should have known the facts, is -- the exception is if a buyer

J14KINGO

1   closes on a contract in full knowledge and acceptance of facts

2   disclosed by the seller which would constitute a breach of

3   warranty.  That's the exception.

4          There is no dispute in this case that their forced

5   outage rate, which resulted in their having to purchase

6   capacity -- more than just this, by the way, your Honor, it

7   created other obligations in addition to just this 3 million,

8   but the forced outage rate was never disclosed.  The purchase

9   obligation, the purchases of capacity, that they entered into a

10  week before this transaction was signed, were never disclosed.

11         So these are examples of the MAEs.  Let's go to the

12  issue of damages now.

13         What are damages?  Under New York law -- and New York

14  law governs here, it's a diversity case, the contract

15  specifically provides that New York law governs -- you measure

16  damages for a breach of contract or a breach of warranty at the

17  date of the breach.  In a valuation, if we were suing for

18  valuation -- and we're really not, but I'm saying we're not

19  saying we're entitled to get the difference between $42 million

20  and what it would have cost if they had disclosed all these

21  things -- in a valuation case, if that were the measure of

22  damages being utilized here, we'd have to measure that

23  valuation at the date of the breach.  The date of the breach

24  here is either the signing or the closing.  It's really the

25  closing of the contract.  The closing of the contract was in

J14KINGO

1    May of 2015, just a couple of months later.  It was very close

2    the period between signing and closing here, your Honor.

3              You do not measure damages.  I can't think of any

4    circumstance -- maybe there's one exception -- two and a half

5    years later.  Their argument is, well, you bought this and you

6    paid $42 million.  If it turns out that two and a half years

7    later the value increased -- and of course we did a lot to the

8    plant, put a lot of money into the plant, operated the plant

9    differently.  All of these things would have changed the value

10   of the plant under any circumstance.  But if it increases in

11   value two and a half years later, you don't have any damages.

12   Well, not surprisingly, they do not cite a single case under

13   New York law which stands for that proposition.  And they will

14   not find a case under New York law that stands for that

15   proposition.

16             THE COURT:  Is Mr. Broughton's math right, by the way,

17   that these same assets were offered for sale or sold two and a

18   half years later for $100 million?

19             MR. BROSTERMAN:  No.  His math is sort of close, but

20   his statement of the facts is wrong.  What happened is, two and

21   a half years later, CCI transferred, after putting a lot of

22   money and a lot of time and a lot of efforts, transferred these

23   assets to its shareholders.

24             THE COURT:  What does that mean?

25             MR. BROSTERMAN:  What it means?

J14KINGO

1          THE COURT:  Yes.

2          MR. BROSTERMAN:  Just what it says.  The shareholders

3     of CCI, instead of keeping the assets in CCI, they moved the

4     assets to the shareholders, and they had to put a value on it.

5     They put a value on it and valued it at a hundred something

6     million dollars.  It is of no consequence; if they had valued

7     it at $20 million or zero or negative, I wouldn't be entitled

8     to recover that difference.  There is no case under New York

9     law which would allow me to recover that difference.  There is

10    no case under New York law which allows them to defend on that

11    ground.  The issue is, what were my damages as a result of

12    their failure to schedule these liabilities out on the seller

13    disclosure as a result of MAE?  They had other liabilities that

14    should have been disclosed, and the answer is pretty simple –

15    for example, in the example we've been talking about, they

16    obligated themselves for the purchase capacity for

17    $3 million -- that was a very significant event -- between

18    December 31, 2013, and March of 2015.

19          We then, we not knowing it, when we bought this, had

20    to pay that extra $3 million over the course of the next year

21    or two.  That $3 million, had we known it, we might have

22    negotiated a different price.  But it's irrelevant whether we

23    did or we didn't; a simple measure of damages is, they

24    purchased $3 million of capacity, it was a very significant

25    event -- we know that because they've admitted a million seven

J14KINGO

 1    is material; if a million seven is material, then $3 million is
 2    twice as material.  What are my damages on that alone?
 3    $3 million.  Because had they disclosed it -- and it was very
 4    easy for them to deal with this, all they had to do was put it
 5    on the schedule -- if they had disclosed it, then I could have
 6    decided, at that point in time, whether to sign this contract.
 7    If they put 3 million on the seller's disclosure schedule right
 8    before the March of 2015 signing, I could say, well, you guys
 9    just did this a week ago, I didn't know about this, you never
10    told me about this, why did you have to do this?  And that
11    would have resulted in a discussion which went something like,
12    well, you know, our outage rate, which, as of December 31,
13    2013, was about 5 or 6 or 7 or 8 percent, is now 25 percent.
14             So all of that would have come to a head, all of that
15    would have been disclosed, and a decision would have been made
16    by CCI at that time whether to buy, or buy at this price, or
17    negotiate a lower price, or not buy at all.  But having failed
18    to disclose it, Judge, New York law is really, really very
19    direct on the issue of damages:  What are my damages?
20    $3 million that you never told me that you've obligated the
21    company to spend, to incur.  That's one example.
22             And we've cited cases -- they're in our letter --
23    Powers v. Stanley Blacker.  There are other cases cited within
24    it.  Every case, it's the same effect - you measure the damages
25    as of the date of the breach.

J14KINGO

1          The rare, rare instance in New York -- as I said, I

2    don't think there are any examples to the contrary -- where, in

3    rare instances, in New York law, you can recover what's called

4    speculative damages or lost profits -- typically, you can't --

5    which are viewed as indirect damages.  We're not seeking

6    indirect damages here.  We're not seeking indirect lost

7    profits.  I'm not even sure you could seek lost profits; it's

8    very hard to obtain under New York law.  All we're seeking is

9    the expenses that we incurred as a result of the MAE or, for

10   example, there's another provision which said that the

11   company -- that all plants, warehouses, structures and other

12   buildings owned or controlled or any company or --

13          THE COURT:  Just slow down, sir.

14          MR. BROSTERMAN:  Sorry, sorry.

15          -- all plants, warehouses, structures and other

16   buildings owned or controlled by any company or any company's

17   subsidiary on the company property have been maintained in

18   accordance with good operating practice.  Then it goes on to

19   explain what good operating practice is.  So it reads much like

20   the words "good operating practice" sound like.

21          I explained that you have to -- the PJM establishes

22   outage rates for the facilities, so that if you have sold 100

23   megawatts of capacity and your outage rate is such that you can

24   only deliver 80 megawatts, then you're going to get hit by PJM

25   with penalties for that difference unless you do something to

J14KINGO

1   cover that transaction by buying capacity, as they did here.

2           You have to -- to determine these outage rates, you

3   have to test the facilities annually.  So in the summer,

4   literally weeks after we purchased these facilities, we had to

5   test the facilities in order to qualify, to create an outage

6   rate which would allow us to sell capacity to PJM going

7   forward.

8           They give us the keys -- they didn't allow us access

9   previously, and there were people that had been prevented from

10  getting into the facilities -- they give us the keys, we go in,

11  and find out that because there are so many engines that are

12  not working, turbines that generate electricity, we have to

13  spend about a million dollars in the month of May and June

14  really just to be able to test.  That's another million

15  dollars' worth of damages as a result of this breach.

16          All of these damages are determinate and determinable

17  based upon the breaches that occurred as of either the date of

18  the signing or really as of the date of the closing, your

19  Honor.  That's the measure of damages.  It doesn't matter if we

20  turn this into the most effective generating facilities in the

21  State of Virginia two and a half years later.  It doesn't

22  matter if our managers were just so superior to their managers

23  that they were able to enhance the value of this in ways that

24  were unexpected.  It, similarly, doesn't matter if we did a

25  miserable job and these facilities, which we paid $42 million

J14KINGO

1   for, two and a half years later are now just, you know, falling

2   apart because of the way in which we've behaved with respect to

3   these facilities over this two and a half years.  We don't get

4   that.  We can't recover that as damages, and they can't, as a

5   defense, rely on any increased value in the facilities.

6           I point out to your Honor -- I said this once, I say

7   it again -- it's not surprising that they have supplied no

8   cases to the contrary under New York law.  That's because there

9   are none, and that's because the cases under New York law are

10  all to the contrary.  They all say essentially the same thing

11  as the cases, as both the Powers case we've cited and the cases

12  cited within Powers and if you -- I'll use the word

13  "Shepardize" -- if you Shepardize those cases, you're going to

14  find legions of cases in New York law, all to the same effect,

15  which is, in a breach of warranty case, which is what this is,

16  a breach of representation, you measure the damages at or about

17  date of the breach, and the date of the breach here is the date

18  of the closing of this contract.

19          THE COURT:  Thank you.

20          Mr. Broughton?

21          MR. BROUGHTON:  Yes, your Honor.

22          I respectfully submit, CCI is missing the point on

23  this as it concerns our request for the valuations.  More

24  specifically, your Honor -- and counsel noted this -- the issue

25  of whether this was material under the contract, a material

J14KINGO

adverse effect is a question of fact.

I disagree with a number of the facts that have been set forth by Mr. Brosterman, but, regardless, the point is that these valuations as to whether this was a material adverse effect, that is, whether the capacity of $2.9 million, which, again, a portion of was a huge money-maker for CCI, or whether the issue of maintenance -- and I will tell your Honor that more engines between signing and closing, there were more engines that were in service at the closing, in other words, Ingenco had continued to bring engines online, and we have the math on that, between signing and closing than there were, but regardless, your Honor, backing up:  The discovery we're requesting, as it concerns these valuations, are directly relevant to the issue of whether this was a material adverse effect that needed to be disclosed regardless.

Put aside the damages issue, I don't disagree that damages are decided at the time of closing, but as to whether this was material or not, from a discovery respect, this is something we respectfully submit that we are entitled to, and ultimately if -- the Court can decide from an evidentiary perspective whether our arguments are value or not, but it certainly is relevant to the issue of materiality.

THE COURT:  Okay.  Actually, I'm prepared to rule on this.  Thank you, both, for that presentation.  They were both very helpful, but I come to the point that Mr. Brosterman made,

J14KINGO

1    actually, that the issue of the valuation is an issue of fact

2    as to whether it's material.  Because of that, although the law

3    apparently is clear, it is a relevant issue in this case; and,

4    therefore, I believe that the documents are relevant and that

5    something concerning the valuations should be provided.  I

6    think that the requests, as I read them, seemed somewhat

7    overbroad, so I would look to the parties, in the first

8    instance, to come to agreement as to what materials may

9    appropriately be given to plaintiffs in connection with the

10   valuations.

11            MR. BROSTERMAN:  I'm sure, your Honor, that we can

12   work something out with Mr. Broughton on the question of

13   documents.

14            THE COURT:  Sure.

15            MR. BROSTERMAN:  I'm not asking you to change your

16   ruling, your Honor -- your Honor has already ruled -- I just

17   want to underscore that materiality doesn't get determined two

18   and a half years later.  It gets determined as of the date of

19   breach, and it doesn't matter if we are a rich company or a

20   poor company.  In other words, it's almost like saying, well,

21   this company has so much money and done so well, that what's

22   material? what's a few million bucks for this company?  That's

23   not the way it works.  You look at the transaction, the very

24   transaction itself, when it closed.

25            Your Honor, if I may move on to something completely

J14KINGO

1    unrelated to your Honor's ruling?

2              THE COURT:  Very well.

3              MR. BROSTERMAN:  I heard you say this to the lawyers

4    who were here previously:  You thought, if they thought it

5    would be helpful for the Court or a magistrate to get involved

6    in the settlement process, they should let the Court know.

7    Mr. Broughton and I, and along with his client, we've had any

8    number of settlement discussions, and we're like, if I may,

9    your Honor, we're like this far apart.

10             Turner, do I have that right?

11             MR. BROUGHTON:  Probably.

12             MR. BROSTERMAN:  Probably.  Maybe it's even closer,

13   depending.  And that gap -- we've tried, both lawyers have

14   really tried, to close that gap, and we have not been

15   successful.  We'll go forward with discovery and we'll finish

16   this off, but I think that it would be a great value if -- a

17   half a day of your Honor's time would be a treasure, if we

18   could, to involve your Honor, if you would do it or a

19   magistrate, in an effort to try to close that gap, because I

20   think it's otherwise -- this will be, I don't know, a three-,

21   four-day trial.

22             THE COURT:  I think that would be very helpful.

23   Obviously, in the scheme of things, these are big numbers, but

24   you're also representing large clients, for whom this matter

25   ought to be settled.

J14KINGO

1          MR. BROSTERMAN:  Agreed.

2          THE COURT:  So what I will do is, I will refer you to

3    the assigned magistrate judge.  Now, as it happens, the

4    assigned magistrate judge is Andrew Peck, who is retired, so

5    that person will have to be --

6          MR. BROSTERMAN:  He would have been great, I know.

7          THE COURT:  He's in private practice as a mediator, I

8    believe.

9          MR. BROSTERMAN:  Well, see if he'll serve as a

10   mediator.  I'm serious.

11         THE COURT:  I don't know that we've admitted him to

12   our mediation panel.

13         MR. BROSTERMAN:  Maybe we can make an exception.

14         Mr. Broughton, I will tell you -- as it's clear from

15   your Honor's remarks -- Judge Peck is particularly good.

16         MR. BROUGHTON:  I'm aware of Judge Peck's reputation.

17   It precedes itself.

18         From our perspective, your Honor -- and I will stand

19   aside so Mr. Brosterman can be seen -- no objection to having a

20   third party involved in trying to help us resolve this.  So

21   that's no issue whatsoever.  I do think, in this case, it

22   probably would be helpful.

23         THE COURT:  Very well.  I'll go ahead and do that.

24   I'll refer it to the magistrate judge.  A new judge will be

25   assigned, and he or she will reach out to the parties.

J14KINGO

1          MR. BROUGHTON:  Yes, your Honor.

2          THE COURT:  Okay?

3          MR. BROSTERMAN:  Thank you, Judge.

4          THE COURT:  Is there anything else we need to do

5     today?

6          MR. BROSTERMAN:  One other thing:  I'm not sure it's

7     necessary right now, but we have a conference scheduled in this

8     case before your Honor.

9          THE COURT:  That's right.  You don't have to come next

10    week.

11         MR. BROUGHTON:  That would be great.

12         MR. BROSTERMAN:  Okay.  And we've got a couple of

13    depositions which may run beyond the discovery cutoff but --

14         THE COURT:  If you guys agree, then you don't have to

15    come back.

16         MR. BROSTERMAN:  We have no problem working things

17    out.

18         MR. BROUGHTON:  Mr. Brosterman and his colleague,

19    Mr. Kahne, have been great -- we've worked well together -- so

20    that should be no issue.

21         THE COURT:  Very well.

22         MR. BROSTERMAN:  Thank you, your Honor.

23         THE COURT:  Thank you, gentlemen.  Have a wonderful

24    weekend.

25         MR. BROUGHTON:  You too.  * * *